# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PATRICO RAMONEZ,

          Petitioner,

                                    CASE NO. 05-CV-71488-DT

v.                                   HONORABLE GEORGE CARAM STEEH

MARY BERGHUIS,

          Respondent.

_____/

## OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS

      Patrico Ramonez ("Petitioner"), a state prisoner confined at the West Shoreline

Correctional Facility in Muskegon Heights, Michigan, has filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of assault with intent to commit

bodily harm less than murder, third-degree home invasion, and aggravated stalking

following a jury trial in the Wayne County Circuit Court in 2001.  He was sentenced to concurrent

terms of 12 to 20 years imprisonment, 2 to 10 years imprisonment, and 2 to 10 years imprisonment

on those convictions.  In his pleadings, Petitioner asserts that trial counsel was ineffective for failing

to investigate and present witnesses for the defense.  For the reasons stated below, the petition

for writ of habeas corpus is denied.

## I.      Facts and Procedural History

      Petitioner's convictions arise from his assault upon Christina Fox, the mother of two of

his children at her home in Detroit, Michigan on April 21, 2000.  The Court adopts Petitioner's

detailed statement of facts and procedural history:

Petitioner Patrico Ramonez was charged with three counts: 1) first-degree home invasion, Mich. Comp. Laws § 750.11a(2); 2) assault with intent to commit great bodily harm, Mich. Comp. Laws § 750.84; and 3) aggravated stalking, Mich. Comp. Laws § 750.411(h). The complainant was Mr. Ramonez's ex-girlfriend, who was the mother of two of his children. The charges arose from an encounter on April 21, 2000. Mr. Ramonez was jury tried before the Honorable Sean F. Cox in the Wayne County Circuit Court in March 2001.

Christina Fox, the complainant, testified that she had a very violent relationship with Mr. Ramonez, the father of her two young children.[1] (T II 132). They moved in together in 1994 or 1995 and stopped living together in 1998. (T II 132).

In April 2000, Ms. Fox moved with her three children to a house on Reiden Street. (T II 132-133, 201-202). Ms. Fox testified that Mr. Ramonez had helped her by watching the children during 2000, when she lived on Ferdinand Street, but that once she moved to the house on Reiden, she did not want him to know where they lived. (T II 133, 195-198). But Diane Torres testified that after Ms. Fox moved, Torres had seen Mr. Ramonez at the Reiden Street house once or twice. (T III 117-118, 121). Once, he came in while she, Ms. Fox, and others were playing cards around 11:30 pm and she and the others left because of his presence. (T III 118, 120-121).

Ms. Fox testified that on April 21, 2000, at about 4:30 or 5 am, as Ms. Fox and her two younger children, Gabriel and Mateo, were asleep in the living room, she heard a knock at the front door. (T II 135). Ms. Fox opened the door a crack, rather than looking out the large window of the door, which was covered with a child's sleeping bag. (T II 136, 187-189, 193).

Ms. Fox saw Mr. Ramonez standing there with his hand on the handle to her screen door. (T II 136). Ms. Fox testified that the screen door was locked and she tried to slam the inner door. (T II 136, 200). She was so scared that she could not get the inner door locked. Ms. Fox testified that Mr. Ramonez busted open the screen door and forced open the inner door, which was wooden, she believed by kicking it in. (T II 137, 193, 198-199). The force with which the inner door was opened knocked down Ms. Fox. (T II 137).

---

[1] Prior to trial, the prosecutor filed a notice that it intended to introduce evidence of past assaults. (T I 148-149). Over defense counsel's objection, the trial court ruled that such evidence would be admitted and that it would give a limiting instruction. (T II 101-106, 114-118). The trial court gave a cautionary instruction prior to opening statements and during its final instructions. (T II 118-119; T V 56-57).

According to Ms. Fox, as she lay on her back on the floor, Mr. Ramonez got on top of her and strangled her, swore at her, and told her she was going to die.  (T II 137-138, 203).  Her body started to shake and "everything started turning black and white" and blurry.  (T II 138).  Ms. Fox was able to remove Mr. Ramonez from being on top of her.  (T II 138).  She kicked him between the legs.  (T II 204).  Mr. Ramonez fell back and she ran out the door.  (T II 138).  Mr. Ramonez came at her on the porch and punched her in the left shoulder.  (T II 139).

She landed on a child's slide in the corner.  (T II 139).  Ms. Fox got up and eluded Mr. Ramonez, but then she noticed three men at the bottom of the porch stairs.  (T II 139).  Two of these men were Charles Tames, Mr. Ramonez's son, and Rene Tames, Mr. Ramonez's step-son.  (T II 139-140).  Ms. Fox turned around and Mr. Ramonez punched her in the left shoulder again.  (T II 140).  Ms. Fox tried to jump over the railing of the porch.  (T II 140).  Her foot caught in the railing and she fell back onto the porch.  (T II 140).

Mr. Ramonez jumped on top of Ms. Fox again.  He strangled her again and repeatedly threatened to kill her.  (T II 140-141).  The men at the bottom of the porch stairs came up onto the porch and Rene Tames put his hands over her mouth to stop her from screaming.  (T II 141, 205).

Ms. Fox saw lights going on and the other two men pulled Mr. Ramonez from Ms. Fox, saying "we gotta go, we gotta go".  The men dragged Mr. Ramonez from the porch.  He was still telling her that she was going to die.  (T II 142).  The men drove off.  (T II 143).

Ms. Fox went inside and called the police.  (T II 143).  According to Ms. Fox, the police came, took a report, told her they could not do anything because she did not have a PPO, and left.  (T II 144).  Ms. Fox testified that she did not seek medical attention for injuries and that the police did not photograph her injuries.  (T II 212).

Officer Giles responded to the scene at 5:20 am and took the initial report.  (T III 97).  Officer Giles testified that Ms. Fox told him that three men had been in the car with Mr. Ramonez, but she did not tell him that the three men assisted Mr. Ramonez in anyway and she did not give a description of the three men or identify them to him.  (T III 99-101).  Ms. Fox did not mention to him that she almost lost consciousness.  (T III 101).  Giles saw "like red bruises around" Ms. Fox's neck and "a little bruise on her left shoulder," but did not photograph these.  (T III 97, 103).

To support the aggravated stalking charge, Ms. Fox testified that Mr. Ramonez hounded her the next day with threatening voicemail calls, leaving 20 to 30 voicemail messages.  (T II 145-147, 216-225; T III 17).  No one else heard the

messages and the complainant claimed Ameritech erased them. (T II 220-228; T III 52-60, 89-92). The complainant's mother testified to being present for one call from Mr. Ramonez and that she heard him say he was coming over to see the children. (T III 65).

The prosecutor presented a great deal of testimony regarding prior alleged incidents of domestic abuse, verbal and physical, by Mr. Ramonez against the complainant occurring in 1998 - 1999, none of which involved the infliction of great bodily harm. (T II 133-135, 148-178, 181-186; T III 35-41, 70-71, 79-80, 82-83, 108-112, 115, 125-133, 135-136, 138).

After the prosecution rested, outside the presence of the jury, the issue of defense counsel's decision not to call any witnesses against Mr. Ramonez's wishes was discussed on the record. (T IV 3-17).

Defense counsel indicated that Mr. Ramonez wished to express his concerns about defense counsel's unwillingness to present the witnesses that Mr. Ramonez wanted to testify on his behalf. (T IV 3-4). Defense counsel indicated to the court that it was his professional opinion that the defense should rest without presenting any witnesses and that Mr. Ramonez would be testifying over his objection. (T IV 3-6, 9-16).

Mr. Ramonez was sworn in and explained to the court that he had written to defense counsel three months prior regarding witnesses that he wanted to testify on his behalf and gave defense counsel the names of three more witnesses when he got to the jail.[2] Mr. Ramonez complained that defense counsel had ample opportunity to get a hold of the witnesses but that none were present and he did not believe that this was fair. (T IV 6).

Mr. Ramonez complained that the three men who were with him the night of April 21, 2000 incident, Charles Tames, Rene Tames, and "Big Bon", needed to be called to testify. (T IV 7). Mr. Ramonez declared: "Your Honor, there was three other people there that night when that incident happened. They were with me. They know exactly what happened. They need to be here, all three of them." (T IV 7).
Mr. Ramonez explained that he wanted his sisters called because they had received phone calls from the complainant and her mother the day after the April 21st incident. (T IV 8).

---

[2] Mr. Ramonez was never out during pre-trial proceedings. He was jailed after his arrest in the instant case and then transferred to the custody of the Department of Corrections after being found in violation of his probation on another case. (See Transcript of Final Conference, 10/13/00, pp 4-5, 8).

Defense counsel indicated that he had contacted some of the witness that could have testified regarding the prior bad acts that the court had allowed in. It was counsel's judgment that his cross-examination of the prosecution's witnesses regarding the prior bad acts had already contradicted the complainant's testimony in that regard in a number of ways. (T IV 10). Defense counsel added that one of the proposed witnesses, Joe Montoya, was reluctant. (T IV 11). Defense counsel also added that he would not want to present witnesses in regard to the prior bad acts testified to by the prosecution's witnesses without putting on Mr. Ramonez, and since he did not want Mr. Ramonez to testify, he would not be putting on such witnesses. (T IV 16).

Defense counsel stated that he had spoken with Mr. Ramonez's sisters, Delores and Amelia. (T IV 8). He indicated that one had a work conflict and was still reluctant after he explained that the court would not allow her to be fired for coming to court, while the other was mentally handicapped, and thus they may not have presented well as witnesses. He also indicated there might be problems with them obtaining transportation from Adrian to Detroit. (T IV 8-11).

Defense counsel indicated that Charles Tames did not have a phone number. (T IV 8).

Mr. Ramonez stated that he had written Charles Tames and his sisters. (T IV 8, 14). Mr. Ramonez stated that if his witnesses were subpoenaed they would be there. (T IV 14).

Mr. Ramonez explained that the only reason he was testifying was because his witnesses were not going to be called. Because he wanted to present a defense and his witnesses were not being called, he had no choice but to testify. (T IV 14).

The prosecutor stated that if the three men who were with Mr. Ramonez on April 21, 2000 were called as witnesses, she would ask the court to appoint them counsel because they could be charged as aiders and abettors. (T IV 14-15). The prosecutor believed that counsel for the men would most likely advise them not to testify. (T IV 15). The prosecutor opined that Mr. Ramonez was just trying to create an appellate issue by asking to have witnesses presented in his defense. (T IV 15-16).

The trial court held that Mr. Ramonez had the right to testify. (T IV 16). The trial court told Mr. Ramonez that it was not the court's role to substitute its judgment for defense counsel's judgment. It would not overrule defense counsel by ordering the witnesses to be presented. (T IV 16-17).

Mr. Ramonez testified that on April 21st, he went to up to the door and knocked.

He had to open the screen door to knock on the inner door.  The complainant pulled aside the covering over the door's window and opened the door for him. (T IV 28).  Mr. Ramonez became angry with her because he did not see his children and she appeared to him to be high.  (T IV 28-30).  Mr. Ramonez pushed her in the chest.  (T IV 30, 103).  The complainant went against the wall and took off running.  She fell down on the porch, on the second of the three steps.  (T IV 31-32, 101-103).  One of his sons got out of the car and helped her up.  (T IV 31).

Mr. Ramonez denied that he choked Ms. Fox.  (T IV 34).  Mr. Ramonez denied leaving Ms. Fox any voicemail messages on April 22, 2000; he denied making threatening calls.  (T IV 56, 59).  Ms. Fox called his residence in Adrian and called the house in Tecumseh, where he was visiting a friend.  (T IV 56, 58).

Mr. Ramonez testified that one day, a week before the April 21st incident, he threatened the complainant that he would report her to Child Protective Services because of her neglect of the children.[3]  Ms. Fox told him that he would never see his kids again.  (T IV 55).

Mr. Ramonez also testified regarding the alleged prior incidents of abuse, disputing some of the allegations and the circumstances of the events.  (T IV 43-51, 61, 64, 91, 94).  Mr. Ramonez acknowledged that he had slapped Ms. Fox in the past and that he also had a problem with drugs, but not as bad as Ms. Fox's drug problem.  (T IV 61, 67, 91).

---

[3]  Mr. Ramonez testified that prior to April 21st, he was last in the Reiden Street house four days to one week earlier.  (T IV 35).  On one occasion, he thought around April 15th, he stopped over around 2:30 am, and found Ms. Fox, Torres, and others up drinking and partying.  (T IV 37).  The children were sleeping on the couch.  (T IV 39).  Mr. Ramonez was upset because he did not believe Ms. Fox would be in a condition to take care of the children when they awoke in the morning, which was a regular problem.  (T IV 37-38).  Mr. Ramonez asked everyone to leave, which they did.  (T IV 38).

Mr. Ramonez had his children often in 2000, and the visits often extended longer than they were scheduled for.  (T IV 41).  Mr. Ramonez had his children for a week, two weeks before Easter 2000.  He stopped by Hannelore Fox's house to discuss the matter.  (T IV 39-40).  He called Ms. Fox and told her that he was bringing home the children, but she told him that she had made plans and did not want them back yet and that she had lost her job.  (T IV 40).

Ms. Fox was using drugs too much and was not keeping food in the refrigerator.  (T IV 40).  A woman, Martha, had moved in with Ms. Fox and was using a lot of cocaine as well. (T IV 55).

During cross-examination and re-cross, the prosecutor questioned Mr. Ramonez at length regarding letters that he wrote after April 21, 2000 to Ms. Fox's mother and to his young sons that contained comments directed to Ms. Fox. (T IV 64-88, 118-135). The prosecutor did not allege that the letters contained threats. (T V 33). The prosecutor repeatedly asked Mr. Ramonez to comment on whether other prosecution witnesses were liars.[4] (T IV 88, 90-95, 97, 99).

During deliberations, the jury sent out a note stating: "We would like the testimony regarding whether or not the defendant forced his way into the door (How did defendant get in the house) (Was there any testimony to indicate Ms. Fox let defendant in the house?)". (T V 77-78). The Court instructed the jurors to rely on their collective memory. (T V 78).

During the next day of deliberations, the jury sent out a note indicating it was deadlocked on count 1, home invasion. (T VI 4, 7). The court read the jury the standard deadlock instruction. (T VI 5-6). Approximately two hours later, the jury reached its verdict. (T VI 9-10).

The jury convicted Mr. Ramonez of the lesser offense of third-degree home invasion[5] and counts 2 and 3 as charged, on March 13, 2001. (T VI 9-10). The trial court sentenced Mr. Ramonez, as a habitual offender – 3rd, Mich. Comp. Laws § 769.11, to prison for concurrent terms of 2 to 10 years for the home invasion, 12 to 20 years for the assault, and 2 to 10 years for the aggravated stalking, on April 3, 2001.[6] (ST 36-38).

Mr. Ramonez appealed by right. While retaining jurisdiction, the Michigan Court of Appeals remanded for a <u>Ginther</u>[7] evidentiary hearing and to allow Mr. Ramonez to move for new trial. (Court of Appeals' order attached as Appendix B).

<u>Ginther Evidentiary Hearing Summary</u>

The <u>Ginther</u> evidentiary hearing was held on September 20, 2002, before the Honorable Sean F. Cox, in the Wayne County Circuit Court. (See GH

---

[4] Defense counsel objected in one instance, belatedly, and the trial court sustained the objection. (T IV 88, 90).

[5] The conviction for third-degree home invasion appears to be a compromise verdict. First-degree home invasion requires the commission of a felony or assault while entering, while inside, or while exiting the house, while third-degree home invasion requires the commission of a misdemeanor under such circumstances. Mich. Comp. Laws § 750.110a. Assault with Intent to Commit Great Bodily Harm is a felony. Mich. Comp. Laws § 750.84.

[6] The original Judgment of Sentence incorrectly indicated that Mr. Ramonez was convicted and sentenced for home invasion of the first-degree, rather than of the third-degree.

[7] <u>People v. Ginther</u>, 390 Mich. 436, 443-444, 212 N.W.2d 922 (1973).

generally).[8]

W. Frederick Moore testified that he served as trial counsel for Mr. Ramonez. (GH 5). Mr. Moore testified that he represented Mr. Ramonez at the preliminary examination and had received discovery materials by that point. (GH 5). Mr. Moore was aware of the three res gestae witnesses, Charles Tames, Renee Tames, and an individual referred to as "Big Bun". (GH 5-6). Mr. Moore and Mr. Ramonez had several conversations regarding potential witnesses. (GH 5).

Mr. Moore testified that prior to trial he spoke with four potential witnesses, including a sister of Mr. Ramonez, an individual that Mr. Ramonez resided with, Defendant Ramonez himself, and another individual. (GH 6). Later Mr. Moore recalled that he spoke with both of Mr. Ramonez's sisters. (GH 15).

Mr. Moore recalled that it would have been difficult to transport one of the sisters from the city of Adrian to the city of Detroit. (GH 15). The other sister indicated that due to conditions at work she did not want to take time off, believing she would be fired if she honored a subpoena. Mr. Moore testified that he will not put reluctant witnesses on the stand because he fears what they might say since they do not want to be there. (GH 15-16). That was his position as to the Ramonez sisters. (GH 16).

Mr. Moore testified that three or four days prior to trial, he attempted to contact Charles Tames. (GH 12). He played "phone tag" with Charles Tames, meaning that they exchanged phone messages. (GH 6, 11-12). Mr. Moore believed that the gist of the messages exchanged related to trying to have the son get in contact with him to see if he could shed light on anything and whether or not he could be beneficial. (GH 7). He believed that he tried to contact Charles two or three times. (GH 11-12). Mr. Moore believed that the contact number that he had for Charles and Renee was the same number that he had for Mr. Ramonez's sisters; it was supplied to him by Mr. Ramonez. (GH 12, 14).

Mr. Moore did not speak with Renee Tames. (GH 7). Mr. Moore never learned the real name for the person referred to as Big Bun. (GH 11). Mr. Ramonez could not give him Big Bun's real name. (GH 11).

When asked his reasoning for not calling the res gestae witnesses, Mr. Moore responded that the complainant had not indicated in the police report that the three individuals were involved, then she had changed her story at the preliminary examination to indicate that they were involved; that the prosecutor "had made overtures regarding having these individuals arrested if, in fact, they appeared to

---

[8] "GH" refers to the transcript of the <u>Ginther</u> Hearing held on September 20, 2002.

testify in court"; and he had "narrowed the focus down of the defense relative to what occurred inside the house."  (GH 8).

Mr. Moore testified that:  "It was my thought that the main issue dealt with what happened inside the house as oppose to what happened before hand and what occurred that made the complainant call the police."  (GH 7).  Mr. Moore testified that his main reason for not calling the three men was that they would not have been able to testify to what had occurred inside the house, which was where the complainant claimed to have been strangled.  (GH 10-11, 16).

Mr. Moore acknowledged that there was an issue concerning how Mr. Ramonez gained entry into the house.  (GH 8).

Mr. Moore's theory of defense was that the complainant was embellishing her story.  (GH 13).  He believed that at trial he showed about nine or ten large discrepancies in her testimony.  (GH 13-14).  Mr. Moore wanted to rest without presenting any witnesses, but Mr. Ramonez insisted on testifying.  (GH 14).

Joel Hackett testified that he was known by the nickname "Big Bun" at the time in question.  He knew Charles Tames, Renee Tames, and Mr. Ramonez because they all worked at the same place.  In April 2000, he went with them from work to Adrian to Detroit.  (GH 18).  They left late, after 11 pm.  (GH 18).  Mr. Hackett testified that he worked the second shift and did not get off from work until 11 pm.  (GH 23).

Mr. Hackett testified that they went to Ms. Fox's house in one car.  (GH 18-19)  They made no stops along the way.  (GH 18, 23).  At the time, Mr. Hackett had no idea that Ms. Fox was Mr. Ramonez's ex-wife.  (GH 22).  Mr. Hackett had never seen Ms. Fox before.  (GH 29).

They pulled up on the street out front.  (GH 19).  Mr. Ramonez went to the door and knocked.  (GH 19).  Mr. Hackett and Charles and Renee Tames remained in the car.  (GH 23).  Mr. Hackett observed Ms. Fox come to the window and then open the door and let Mr. Ramonez in.  (GH 19).  After several minutes, he heard yelling.  Mr. Hackett testified that he and the others then got out of the car.  Mr. Hackett went up onto the porch.  He saw Ms. Fox pushing at Mr. Ramonez and yelling.  Mr. Ramonez was holding her back as she tried to hit him.  Ms. Fox was screaming at Mr. Ramonez; but Mr. Hackett could not make out the words.  (GH 19-20, 23-24).  Then Ms. Fox came outside and went running down the street yelling.  (GH 20, 24-25).  The men left and went out to eat.  (GH 20-21).  Then they returned to Adrian.  (GH 21).

Mr. Hackett testified that Mr. Ramonez did not force open the door at Ms. Fox's house.  (GH 19-20).  When Mr. Ramonez stepped into the house, Mr. Hackett

could still see him through the big glass storm door.  The inner door was open.
(GH 20, 25).  Mr. Ramonez remained in the doorway area.  (GH 25).  Mr. Hackett
testified that he only lost sight of Mr. Ramonez inside the house, "if at all," for
"maybe not even two minutes."  (GH 20, 25-26).  He did not observe Mr.
Ramonez choke or punch Ms. Fox.  (GH 20).  Mr. Ramonez was not attacking
Ms. Fox, he was trying to hold her back to protect himself.  (GH 28).  Mr. Hackett
testified that Ms. Fox "looked like she was on something," as if she was high.
(GH 28).

Mr. Hackett testified that Renee and Charles Tames knew his real name, but Mr.
Ramonez only knew him by his nickname.  Mr. Ramonez was not "a real personal
friend" of his.   (GH 21).  After this occurrence in April 2000, Mr. Hackett only
continued working with Charles and Rene for a short time.  (GH 26-27).  He
remained friends with Renee; they had some contact in 2000 and part of 2001, but
Mr. Hackett lost track of him for awhile.  (GH 27).

Mr. Hackett did not learn until two or three months before the <u>Ginther</u> hearing
that Mr. Ramonez had been arrested and charged for his interaction with Ms. Fox
that night.  (GH 21).  He learned of it when he went through the "drive through"
at a Burger King and Renee's sister Margo asked him who he was and things
progressed from there to him testifying at the <u>Ginther</u> hearing.  (GH 27).

Mr. Hackett would have been willing to testify at Mr. Ramonez's trial if he had
been called or subpoenaed.  Mr. Hackett would have testified at the trial even if
the prosecutor had threatened to charge him as an accessory.  (GH 21).

Renee Tames testified that Mr. Ramonez is the father of his brother and sister.
(GH 30).  Renee considers Mr. Ramonez a father figure to him.  (GH 41).

Renee testified that in April 2000, he went to Detroit with Mr. Ramonez, Joel
Hackett, who he called by the nickname "Big Bun", and Charles Tames.  (GH 30,
37).  They all worked the second shift together at the time.  They left from work
in the city of Manchester around 11 pm or midnight.   (GH 30-31).

Renee testified that they went to Detroit to look for Mr. Ramonez's kids.  (GH
31). Renee had never met Ms. Fox before.  (GH 38).

They went to Ms. Fox's house, but the lights were out and she was not home.
(GH 32).  They drove to a few friends' house and were informed that she was at a
bar.  They went to the bar and she was there.  (GH 32).  They could not go into
the bar because Charles was not of legal drinking age.  (GH 38).  Later, they went
back to the house.  (GH 32)

Back at the house, Mr. Ramonez knocked on the door.  Renee testified that he

saw Ms. Fox peek out of the window and then she opened the door. (GH 32). Renee remained in the car, but could see both Ms. Fox and Mr. Ramonez in the doorway. (GH 39). Renee heard Mr. Ramonez ask her where the kids were. (GH 33). Ms. Fox appeared to be in a daze. (GH 33). She and Mr. Ramonez started yelling at each other. (GH 33). Renee heard Ms. Fox say that she did not know where the kids were. (GH 33). The yelling continued and Ms. Fox "got all up in [Mr. Ramonez's] face." (GH 33). Ms. Fox was pushing Mr. Ramonez. Mr. Ramonez put his hands on her to stop her. (GH 34). Renee testified that he did not observe Mr. Ramonez choke Ms. Fox or otherwise attack Ms. Fox. (GH 34, 45). Ms. Fox turned and started screaming. She screamed that Mr. Ramonez would never see his kids again. Then she ran off screaming. (GH 34).

Renee testified that he and the others got out of the car when Ms. Fox started screaming, but by then she was already running. (GH 34, 39-40). Ms. Fox stumbled over her feet, fell, and screamed even more. (GH 34). Renee was on the steps next to the sidewalk. (GH 46). One of them may have helped her up, but Renee could not recall for sure. (GH 40-41).

Neither the police nor the prosecutor nor Mr. Ramonez's trial attorney ever contacted Renee. (GH 35). Renee testified that he expected to be called to testify. His mother, Margarita Tames, had told him to expect to be subpoenaed, but he was not. (GH 35, 42). His mother was in contact with Mr. Ramonez after his arrest in this case. (GH 41). His mother told him that Mr. Ramonez was going to have his lawyer subpoena the witnesses. (GH 41). Renee did not know the trial date and did not know Mr. Ramonez's lawyer's name. (GH 42). He could not recall if his mother told him the lawyer's name, but she did give him a phone number for the lawyer. (GH 42, 44). He called it, but all he got was a dial tone like sound. (GH 42). His mother tried the number and got the same thing. (GH 42).

Renee testified that he would have known how to contact Mr. Hackett (Big Bun) at the time. (GH 35).

Renee did not live with his brother Charles Tames in April 2000 and does not live with him now. (GH 36). Charles would have known how to reach him; they had each other's phone numbers and spoke on a regular basis. (GH 36). Renee did not live with Mr. Ramonez's sisters, Amelia and Delores, but they knew where he lived then. (GH 36). In April 2000, Renee lived in Tecumseh, Michigan. (GH 37).

Renee would have been willing to testify at Mr. Ramonez's trial if he had been called or subpoenaed. Renee would have testified at the trial even if the prosecutor had threatened to charge him as an accessory. (GH 36).

Charles Tames testified that Mr. Ramonez is his father and Renee Tames is his brother. (GH 48). He knew Joel Hackett from work; he called him Big Bun. (GH 48, 62).

One day in April 2000, they all got off work around 11 pm and went to Ms. Fox's house in Detroit. (GH 48). They drove around a little before stopping at Ms. Fox's house. (GH 56). He did not recall if they made any stops first. (GH 57).

When they arrived, Mr. Ramonez went up to the house. Charles saw Ms. Fox peek out the window and opened the door for Mr. Ramonez without him even knocking. (GH 48, 57). Mr. Ramonez did not force open the door. (GH 49). Charles testified that Ms. Fox invited Mr. Ramonez in, but he never really made it inside because they started to argue. (GH 48, 57). Mr. Ramonez never made it all the way in the house, just a step inside. (GH 58). Ms. Fox was swearing and "getting in [Mr. Ramonez's] face". (GH 49). Mr. Ramonez put his hands out, trying to prevent her from getting any closer. (GH 49). Charles could not hear Ms. Fox clearly. (GH 57).

Charles got out of the car and went up to the porch. (GH 49). Renee and Mr. Hackett got out of the car as well and followed him to a certain extent. (GH 58-59). Charles testified that he asked Ms. Fox why she was acting this way. She replied that she was going to have Mr. Ramonez locked up for a long time. (GH 50, 59). She continued screaming, "started going hysterical". (GH 59). She was "yelling about the kids and about things like that." (GH 60).

Ms. Fox started running down the stairs and fell near the bottom stair. (GH 50, 60). Charles tried to help her up, but she swore and yelled at him. (GH 50). She "started yelling something like that she was going to make sure that my dad was going to be locked up." (GH 61). Then she ran down the road. (GH 50).

Charles testified that Ms. Fox and Mr. Ramonez were always in his sight. (GH 49). Mr. Ramonez did not punch or choke Ms. Fox. (GH 50).

Afterwards, Charles learned that Mr. Ramonez was arrested. (GH 50). He did not know the exact nature of the charges against Mr. Ramonez. (GH 54).

Neither the police nor defense counsel ever contacted Charles. (GH 50). Charles testified that he tried to contact Attorney Moore "at least three times" and that he left his phone number several times on Mr. Moore's answering machine so that Mr. Moore could contact him. (GH 51, 54). Charles did not recall who gave him Mr. Moore's name and number. (GH 62). Charles made sure that he left his mother's phone number, because she has an answering machine, but Mr. Moore

did not return his calls as far as he knew.[9]  (GH 51, 54-55).  Charles' calls to Mr. Moore were each separated by three or four days.  (GH 54).  Charles never received any paperwork from Mr. Moore.  Charles surmised from all of this that Mr. Moore did not need him or the others for the trial.   (GH 51).  Charles was aware at the time of how to get in touch with Renee and Mr. Hackett.  (GH 51).

Charles believed his mother tried to contact Mr. Ramonez during this time period.  (GH 55).  He and his mother were on different work schedules, so they barely saw each other.  (GH 61).  Charles did not speak with Mr. Ramonez while Mr. Ramonez was incarcerated prior to his trial.  (GH 55).

Charles was not aware of the trial date.  (GH 55).  He testified that that was the kind of information he wanted to get from Mr. Moore.  (GH 55).

Charles testified that sometime around a month or two after his father was sentenced, he moved to the state of Texas.  (GH 52-53).

Charles would have been willing to testify at Mr. Ramonez's trial if he had been called or subpoenaed.  Charles would have testified at the trial even if the prosecutor had threatened to charge him as an accessory.  (GH 51).

After hearing the parties' arguments, the trial court denied the motion for new trial.  (GH 63-74; Trial Court's Order attached as Appendix C).  The trial court found that Attorney Moore's performance was not deficient because it was Attorney Moore's professional judgment that the focus of the defense be on what occurred inside the house and his "expectation" was that the three men would not be able to offer helpful testimony in that regard. (GH 72-73).  The Court went on to find that Mr. Hackett "was not a particularly helpful witness" and that Renee Tames was an "incredible witness" and thus any alleged error "would not [have] change[d] the results" of the trial.  (GH 73-74).

State Appellate Courts' Decisions After Remand

The Michigan Court of Appeals affirmed Mr. Ramonez's convictions and sentences, with the exception that it remanded for correction of the Judgment of Sentence to reflect that Mr. Ramonez was convicted of third-degree home invasion rather than first-degree.  (Michigan Court of Appeals, unpublished, per curiam opinion, dated June 24, 2003 attached as Appendix A).  The Court of Appeals agreed with the trial court, holding "[b]ased on the lower court record and the Ginther hearing, we find that defense counsel's performance was not deficient with respect to his decision to not call the witnesses." (Appendix A –

---

[9]  Charles' mother is Margarita Tames.  (GH 54).

Court of Appeals' Opinion, p 3).

Mr. Ramonez applied for leave to appeal in the Michigan Supreme Court, including his claim of ineffective assistance of counsel. On April 16, 2004, the Michigan Supreme Court denied leave to appeal "because we are not persuaded that the questions presented should be reviewed by this Court."[10] (Michigan Supreme Court's Order, docket no. 124464, entered April 16, 2004, attached as Appendix D).

Memorandum of Law in Support of Petition, pp. 1-18 (filed by Jacqueline J. McCann, SADO).

Petitioner, through counsel, thereafter filed the present petition for writ of habeas corpus

asserting the following claim:

Mr. Ramonez's federal constitutional right to the effective assistance of counsel, U.S. Const. Amend. VI, XIV, was violated where trial counsel failed to investigate and present a substantial defense, *i.e.*, crucial *res gestae* witnesses. A writ of habeas corpus must be issued.

Respondent has filed an answer to the petition asserting that it should be denied for lack of merit.

Petitioner has filed a *pro se* reply to that answer.

## II.    Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his

habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997). The AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)      resulted in a decision that was contrary to, or involved an unreasonable

---

[10]  Justices Marilyn Kelly and Stephen J. Markman would have remanded Mr. Ramonez's case to the Court of Appeals for reconsideration of his sentencing issue in light of the Michigan Supreme Court's then recent decision in People v. Babcock, 469 Mich 247 (2003).

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require

citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**III.    Analysis**

Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to investigate and present witnesses in support of his defense. Respondent contends that this claim lacks merit.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside

the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong of *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003). A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Strickland*, at 466 U.S. at 694. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

In this case, the Michigan Court of Appeals determined that Petitioner failed to establish that trial counsel was ineffective, stating in pertinent part:

> A defendant seeking a new trial on the ground that trial counsel was ineffective bears a heavy burden. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *Carbin, supra*. First, the defendant must show that counsel's performance was deficient, *i.e.*, that counsel made errors so serious that counsel was not performing as the "counsel" guaranteed by the Sixth Amendment. *Id*. The defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id*. Second, the defendant must show that the deficient performance prejudiced the defense, *i.e.*, a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id*. A reasonable probability is a

17

probability sufficient to undermine confidence in the outcome. *Id*.

Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *People v Daniel*, 207 Mich App 47, 58; 523 NW2d 830 (1994).

We are not persuaded that defense counsel was ineffective for not calling defendant's two sisters as witnesses. Neither sister had personal knowledge of the charged offenses. While they allegedly would have testified that the victim called them sometime after the offense, their testimony would not have refuted the victim's version of the relevant events. Moreover, defense counsel explained at the post-trial *Ginther* hearing that he decided not to call the sisters as witnesses because one sister's memory was shaky and the other sister was reluctant to testify. Based on the record, we find that defendant has failed to overcome the presumption of sound trial strategy.

We also reject defendant's assertion that defense counsel was ineffective for failing to call the three men who were present during the incident giving rise to the charges. After the prosecution rested and outside the presence of the jury, defense counsel informed the trial court of his opinion that the defense should rest without calling any witnesses. In his opinion, the cross-examination was sufficient to place the victim's testimony in doubt. Defense counsel also stated that he did not believe he should call any witnesses unless defendant testified; however, because in his opinion defendant should not testify, he would not be calling any witnesses. Defense counsel further informed the trial court of his belief that if any of the three witnesses did testify, they would be arrested. Furthermore, the prosecutor stated that if any of the witnesses testified, they would require counsel because they would be considered aiders and abettors. At the *Ginther* hearing, defense counsel reiterated his reasons for not calling any of three witness and testified additionally that the witnesses would not have been able to testify about what occurred between defendant and the victim inside the house, which was the focus of the defense theory.

At the conclusion of the *Ginther* hearing, the trial court found that defense counsel was a credible witness. The court noted defense counsel's strategy to focus on what occurred inside the house and his professional judgment that the three witnesses could not support this defense. The trial court also found that Joel Hackett was not a particularly helpful witness and that he had testified inconsistently that the men made no stops before going to Detroit. The trial court also found that Renee Tames was not a credible witness and that he contradicted Hackett. The trial court concluded that defense counsel investigated

and presented a substantial defense and his decisions were well within professional standards. Finally, the trial court found the three witnesses would not have provided testimony that would have changed the trial's outcome. We do not find clear error in the trial court's findings. Based on the lower court record and the *Ginther* hearing, we find that defense counsel's performance was not deficient with respect to his decision to not call the witnesses..

*People v. Ramonez*, No. 234915, 2003 WL 21464798, *1-3 (Mich. Ct. App. June 24, 2003)

(case citation footnote omitted).

Having reviewed the record, the Court concludes that the Michigan Court of Appeals' decision is neither contrary to *Strickland* nor an unreasonable application of federal law or the facts of this case. It is well-established that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Wiggins*, 539 U.S. at 524-29 (abandoning an investigation at an unreasonable juncture may prevent counsel from making an informed strategic decision); *Parrish v. Towns*, 395 F.3d 251, 258 (6th Cir. 2005). This duty includes an obligation to investigate all witnesses who may have information concerning a defendant's guilt or innocence. *Parrish*, 395 F.3d at 258. While courts give considerable deference to counsel's strategic decisions, those decisions must be reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

In this case, trial counsel reasonably investigated and decided not to call Petitioner's two sisters as witnesses for the defense. First, the record reveals that counsel spoke to Petitioner and the witnesses about their proposed testimony. Counsel discovered that one sister was a reluctant witness due to work obligations and the other sister suffered from a physical disability which made travel from Adrian to Detroit difficult. Counsel also knew that the sisters were not present during the incident and that their proposed testimony went to tangential matters. Given

19

these circumstances, counsel reasonably decided not to produce the sisters at trial. Moreover, even if counsel could be said to have erred in this regard, Petitioner has failed to establish that he was prejudiced by counsel's conduct. The sisters' testimony was not exculpatory and, given the other evidence at trial, there is no reasonable probability that the testimony would have affected the outcome of the proceedings. Habeas relief is not warranted on this basis.

Counsel's performance with respect to the three men who witnessed the incident is more troublesome. While counsel was aware of those witnesses and spoke to Petitioner about them, he did not contact those witnesses before trial. Two of the men were Petitioner's sons and one was a man with whom they had worked. While counsel played "phone tag" with one son, Charles Tames, prior to trial, he did not speak to him, nor did he contact the other son, Renee Tames, or learn the identity of the third man, Joel Hackett, from the two sons. At trial, counsel indicated that his strategy was to rely upon his cross-examination of the victim and rest without calling Petitioner or any witnesses to testify. At the evidentiary hearing, counsel explained that he was concerned about the witnesses' ability and willingness to testify given their possible criminal exposure. He also said that he did not think that the witnesses could provide testimony about what occurred inside the victim's home, which was the focus of his defense theory. The Michigan Court of Appeals found counsel's decisions and actions reasonable under the circumstances. If the Court were reviewing this case on direct appeal, it likely would have found that defense counsel's investigation was deficient because counsel did not speak to the three men who were witnesses to the incident before making a decision not to produce them at trial. However, on habeas review, the Court cannot say that the state court's decision is contrary to *Strickland* or an unreasonable application thereof. A reasonable jurist could

conclude that counsel reasonably determined that further investigation of the three men was unnecessary based upon his conversations with Petitioner, the other evidence, and his defense theory.

Nonetheless, even if counsel's investigation is deemed deficient, Petitioner is still not entitled to habeas relief as he has not established that he was sufficiently prejudiced by counsel's conduct. While the testimony of the three men would have been exculpatory to some degree, supporting Petitioner's testimony that he did not force his way into the home and that he did not choke the victim, it would not have exonerated Petitioner. Based upon the evidentiary hearing testimony, all three witnesses would have placed Petitioner at the victim's home during the early morning hours and confirmed that he assaulted her to some degree. Joel Hackett even admitted that Petitioner and the victim were out of his sight inside the home for two minutes.

Additionally, the three witnesses would have been subject to damaging cross-examination by the prosecution given the inconsistencies in their testimony, their potential knowledge of Petitioner's past abuse, their relationships to Petitioner, and their involvement in the incident.

Lastly, the prosecution presented significant evidence, including the victim's testimony, the police testimony confirming her injuries, and the history of past abuse, to support Petitioner's convictions. Given these circumstance, Petitioner cannot establish that he was prejudiced by counsel's decision regarding the investigation and production of the three men. At the very least, the Court cannot conclude that the state court's decision in this regard is contrary to *Strickland* or an unreasonable application thereof. Habeas relief is not warranted on this claim.

**IV.** **Conclusion**

For the reasons stated, this Court concludes that Petitioner is not entitled to federal

habeas relief on the claim presented in his petition.

Accordingly;

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.


S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated:  May 22, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on May 22, 2006, by electronic
and/or ordinary mail.


S/Josephine Chaffee
Secretary/Deputy Clerk